

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PURCHASE REAL ESTATE GROUP INC.,
JOSEPH LaMANNA, JOHN DeBELLO, AND
ANTONELLA DeBELLO,

                    Plaintiffs,

          v.

STEPHEN JONES, ESQ., NANCY ARMANO,
JOHN LISCIO, JOHN LISCIO INSURANCE
CO., ROBERT DiDONATO, JULIA B. FEE
REAL ESTATE A/K/A JULIA B. FEE, LLC,
HOWARD RIPPS, JUDICIAL TITLE
INSURANCE AGENCY, LLC, DANIEL
FORBES, DOMINICK DeVITO, JR., SHERRI
DeVITO, DOMINICK DeVITO, SR., ALBERT
TARANTINO, LOU CARDASCO, THE
CRYSTAL RESTORATION CORPORATION,
LOUIS CHERICO, ESQ., CHRISTIAN
ZEBICOFF, ESQ., THE JOHNSON FAMILY
TRUST, JONES, SLEDZIK, GARNEAU &
NARDONE, P.C., AND JOHN AND JANE
DOES 1-10, all being persons unknown,

                    Defendants.

05 Civ. 10859

ORDER AND OPINION

**LORETTA A. PRESKA, United States District Judge:**

      Purchase Real Estate Group Inc., Joseph LaManna, John DeBello, and Antonella DeBello

(collectively, "Plaintiffs"), brought this action alleging violations of the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, conspiracies to violate

RICO, 18 U.S.C. § 1962(d), and twelve state law claims[1] against fifteen individuals, an insurance

brokerage firm, two real estate agencies, a title insurance agency, a first responder to home

---

[1] The state law claims include fraudulent concealment, fraud in the inducement, fraud in the factum, breach of
fiduciary duty, legal malpractice, professional malpractice, negligence, larceny by trick, intentional interference with
prospective economic advantage, wrongful civil proceeding, abuse of process, and conversion.

emergencies, two law firms, a trust, and two miscellaneous businesses (collectively, "Defendants").

This Court held oral argument on various Defendants' motions to dismiss on November 7, 2006. By Opinion and Order dated April 30, 2010, this Court granted motions to dismiss filed by the following groups of Defendants: (1) Judicial Title Insurance Agency, LLC; (2) Dominick DeVito, Jr., Sherri DeVito, Dominick DeVito, Sr., and The Johnson Family Trust; (3) Louis Cherico; (4) Howard Ripps; (5) Robert DiDonato and Julia B. Fee Real Estate a/k/a Julia B. Fee, LLC; (6) John Liscio and John Liscio Insurance Agency;[2] (7) Lou Cardasco and Crystal Restoration Corporation; and (8) Nancy Armano.[3]

Currently before this Court are motions to dismiss the Amended Complaint filed by the following groups of Defendants: (1) Albert Tarantino; and (2) Stephen Jones, Christian Zebicoff, and Jones, Sledzik, Garneau & Nardone, P.C ("The Jones Firm").

For the reasons set forth below, this Court grants both motions to dismiss.

## I.   BACKGROUND[4]

In May 2002, the Purchase Real Estate Group, Inc. ("PREG") was created to facilitate John and Antonella DeBello and Dominick DeVito, Jr.'s business plan of purchasing luxury properties, refinancing and improving the properties, selling the properties at a profit, and reinvesting the earnings back into PREG. See Am. Compl. ¶ 51. Plaintiffs claim that DeVito, Jr. and Daniel Forbes conspired with numerous individuals—including three attorneys (Louis Cherico, Stephen Jones, and Christian Zebicoff), a real estate broker (Robert DiDonato), an

---

[2] John Liscio Insurance Agency was sued as John Liscio Insurance Company.
[3] The following Defendants named in the Amended Complaint have also been terminated from this action: Cherico & Cherico Associates, Concourse Foot Care, P.C., Daniel Forbes, Barry Levites, Levites Realty Management Corporation, George Stone, and Oak Valley Real Estate Group Corporation.
[4] The facts provided are as alleged by Plaintiffs, with all reasonable inferences drawn in Plaintiffs' favor. See infra Part II.

insurance agent (John Liscio), and a building contractor (Louis Cardasco)—to defraud Plaintiffs in connection with a series of real estate transactions made pursuant to this business plan. *See id.* ¶¶ 46, 50. Plaintiffs allege that, pursuant to Defendants' scheme, they purchased these properties by taking out millions of dollars of mortgages. *See id.* ¶ 4. The foregoing mortgages were allegedly based "upon fraudulent and inflated property appraisals" such that Plaintiffs obligated themselves to pay purchase prices and mortgages "that were over and above the fair market values of the real estate." *See id.* Plaintiffs also obtained $1.075 million in loans from Levites.[5] *See id.* ¶ 144. Plaintiffs deposited the Levites loans and other funds for the PREG business into a PREG financial account. *See id.* ¶¶ 5, 69, 112, 146, 160.

Plaintiffs contend that DeVito, Jr., Sherri DeVito, Forbes, and DiDonato, with the assistance of other Defendants, subsequently misappropriated funds from the PREG account. *See id.* ¶¶ 5-6, 146-47, 162. Plaintiffs also claim that the Levites loans were obtained by cross-collaterizing LaManna's property, without his authorization or knowledge. *See id.* ¶¶ 148, 152, 155. Plaintiffs assert that this cross-collateralization reduced LaManna's ability to realize the equity present in his property. *See id.* ¶ 153. Plaintiffs moreover allege that Forbes absconded from The Jones Firm with documents relating to LaManna's real estate and loan closing costs. *See id.* ¶ 170. Plaintiffs claim that Zebicoff, Jones, and The Jones Firm gave Forbes access to these documents without LaManna's authorization. *See id.* ¶¶ 169-70.

Plaintiffs further allege that in June and July 2004, DeVito, Jr., with assistance from DeVito, Sr. and Sherri DeVito, filed fraudulent mechanics liens in the amounts of hundreds of thousands of dollars on certain of the properties purchased by LaManna. *See id.* ¶¶ 192, 195, 202, 205. DeVito, Jr. claimed that the liens were for services he performed on the properties and

---

[5] It is not clear from the Amended Complaint whether Plaintiffs allege that the loans were obtained from Barry Levites or Levites Realty Management Corporation, both of which are former Defendants in this action.

for which he had not been paid, though Plaintiffs contend that DeVito, Jr. was incarcerated at the time he supposedly performed these services. *See id.* ¶¶ 193, 203. Plaintiffs assert that Sherri DeVito and DeVito, Sr., along with others, filed perjured affidavits in support of the liens. *See id.* ¶¶ 195, 205. LaManna ultimately succeeded in removing the liens, but claims to have spent more than $40,000 in legal fees to do so. *See id.* ¶¶ 200, 207.

Plaintiffs additionally allege that Sherri DeVito, Forbes, and Liscio, along with others, submitted fraudulent insurance claims in LaManna's name, without LaManna's knowledge or consent, for various properties that LaManna and DeBello had purchased as part of PREG's business plan. *See id.* ¶¶ 208-29. Plaintiffs claim that Cardasco, on behalf of Crystal Restoration Corporation, fraudulently inflated the value of the services they provided, thereby inflating the insurance claims. *See id.* ¶ 218. Plaintiffs allege that DeVito, Jr., Sherri DeVito, Forbes, Liscio, and Cardasco intercepted and cashed numerous of the claims checks resulting from the fraudulent claims. *See id.* ¶¶ 220, 228. Plaintiffs also claim that, as a result of the numerous false insurance claims, LaManna and DeBello have been unable to secure insurance on the properties or have been forced to pay exorbitant insurance rates. *See id.* ¶ 229.

The properties purchased by Plaintiffs and the alleged circumstances surrounding the transactions are described in greater detail below.

### a. The Pinehurst Property

In or around July 2002, LaManna purchased the property at 29 Pinehurst Drive, Purchase, New York ("the Pinehurst Property"), for $900,000. *See id.* ¶¶ 60-61, 69. LaManna purchased the property based on various representations made by DeVito, Jr., Forbes, and DiDonato, including real estate appraisals that they provided to LaManna indicating that the property would be worth at least $2 million. *See id.* ¶¶ 63-66. Based on these representations, LaManna

obtained financing for the property from two banks. *See id.* ¶ 69. At the direction of Forbes and

DeVito, Jr., LaManna also invested $322,000 in PREG for renovations to the property. *See id.* ¶

61, 69. The Pinehurst Property transaction was arranged with the assistance of DeVito, Jr., who

coordinated all aspects of the purchase, Forbes, who arranged the financial aspects of the

transaction, DiDonato, who acted as the real estate agent, Cherico, who acted as counsel, and

Ripps, an employee of Judicial Title Insurance Agency who acted as title closer at the closing.

*See id.* ¶ 72.

After the closing, LaManna learned that he had purchased the property from DeBello,

rather than from the property's original owner, as LaManna had been led to believe. *See id.* ¶¶

72, 74, 77-78. DeVito, Jr., Forbes, Jones, The Jones Firm, and Cherico participated in the

intervening sale between the original owner and DeBello. *See id.* ¶ 74. Plaintiffs allege that this

intervening sale increased the tax and fee obligations on the property. *See id.* ¶ 86.

### b. The Purchase Street Property

In January 2003, LaManna purchased the property at 3801 Purchase Street, Purchase,

New York ("the Purchase Street Property") from The Johnson Family Trust, which was owned

and controlled by DeVito, Jr., Sherri DeVito, DeVito, Sr., and Patricia DeVito. *See id.* ¶¶ 87, 90,

111. LaManna purchased the property based on representations made by DeVito, Jr., Forbes,

and DiDonato that the property was worth at least $7 million. *See id.* ¶ 93. The trio allegedly

provided LaManna with false real estate appraisals to corroborate their representations regarding

the value of the property. *See id.* ¶¶ 95-96. Based on DeVito, Jr. and Forbes' assurance that $4.9

million in financing had been pre-approved from various banks, LaManna assumed $3.7 million

of existing debt and delinquent taxes associated with the Purchase Street Property, which he

believed he could retire with the $4.9 million loan. *See id.* ¶¶ 97, 111, 128. Upon DeVito, Jr.'s

5

advice, LaManna also deposited $250,000 into the PREG account for renovations to the

property. *See id.* ¶¶ 112, 128. Plaintiffs claim that the $4.9 million financing never materialized.

*See id.* ¶¶ 100, 129. Plaintiffs also allege that the money deposited into the PREG account was

not used for renovations to the Purchase Street Property. *See id.* ¶ 112. The Purchase Street

Property transaction was arranged with the assistance of DeVito, Jr., who coordinated the

purchase, DiDonato, who acted as the real estate agent, Cherico, who provided legal advice

between November 2002 and January 2003, Forbes and Jones, who represented LaManna at the

closing, and Ripps, who acted as title closer at the closing. *See id.* ¶¶ 101-02, 135, 163.

LaManna contends that, prior to his purchase, he was falsely told by DeVito, Jr., Forbes,

and Cherico that Nancy Armano had a first right to acquire the Purchase Street Property. *See id.*

¶¶ 103-04. Based on the advice of DeVito, Jr., Forbes and Cherico, LaManna paid Armano

$10,000 to waive her purported right. *See id.* ¶¶ 105, 107-08. Plaintiffs allege that Armano

never had such a right. *See id.* ¶ 106.

In addition, at the time of the purchase, LaManna believed he was purchasing the entire

parcel, which consisted of four acres of land, a large main house, and a separate carriage house.

*See id.* ¶¶ 89, 114, 133. However, Cherico had purchased approximately 2.5 acres of the front

part of the property ("the Cherico parcel") in November 2002, at the time that Cherico was

purportedly reviewing whether there were any impediments to LaManna's purchase. *See id.* ¶

117. The sale of the Cherico parcel was accomplished through straw man transactions: The

Johnson Family Trust sold the Cherico parcel to Armano in November 2002, who then sold it to

Albert Tarantino on the same day. *See id.* ¶¶ 118-20. Cherico prepared both sets of documents.

*See id.* ¶¶ 119-20. In January 2005, Tarantino executed a deed for the Cherico parcel to

Tarantino and Cherico for nominal consideration. *See id.* ¶ 123. Plaintiffs allege that Cherico's

6

ownership of the Cherico parcel substantially reduced the value of LaManna's interest, while leaving LaManna with the $3.7 million mortgage and the delinquent taxes on the entirety of the property. *See id.* ¶¶ 127-29, 131.

Finally, Plaintiffs claim that the Purchase Street Property was clouded by a fraudulent $410,000 lis pendens action placed on the property due to a prior DeVito, Jr. judgment. *See id.* ¶ 171. Plaintiffs allege that Cherico, Jones, Ripps, and Judicial Title Insurance Agency had identified the judgment pursuant to the due diligence and title review that they conducted, but failed to inform LaManna of it before he purchased the property. *See id.* ¶ 171. Plaintiffs claim that the lis pendens was placed on the Purchase Street Property by Sherri DeVito, DeVito, Sr., and/or Forbes, acting at DeVito, Jr.'s instruction. *See id.* ¶ 173. LaManna claims to have spent more than $50,000 during various legal proceedings trying to remove the lis pendens. *See id.* ¶ 174.

### c.  The Scott Circle Property

On an unspecified date, LaManna also purchased the property at 28 Scott Circle, Purchase, New York ("the Scott Circle Property"). *See id.* ¶ 155. LaManna purchased the property based on representations by DeVito, Jr., Forbes, and DiDonato that the property could be cleared, subdivided, and resold as two new properties, contingent upon approval by the Harrison Town Board. *See id.* ¶¶ 155, 161. Plaintiffs allege that Forbes indicated to LaManna that he was managing the requisite applications to obtain approval, but Plaintiffs maintain that no applications were filed. *See id.* ¶ 161.

The Scott Circle Property served as security for a $550,000 loan from Levites. *See id.* ¶¶ 154-55. In December 2004, Levites informed LaManna that it was commencing foreclosure proceedings against the property. *See id.* ¶ 175.

### d.  The Oak Valley Property

During an unspecified time period, DeVito, Jr., Forbes, and DiDonato pressured LaManna and DeBello to purchase the property at 9 Oak Valley, Purchase, New York ("the Oak Valley Property") at what Plaintiffs claim was an artificially inflated and fraudulent price. *See id.* ¶¶ 177-78.  Plaintiffs allege that the property had already been purchased by DiDonato, as DeVito, Jr. and Forbes's straw man. *See id.* ¶ 177.  Plaintiffs claim that, although neither DeBello nor LaManna purchased the Oak Valley Property nor authorized any expenditures related to the property, thousands of dollars were withdrawn from the PREG account to finance the renovation and carrying costs of the property. *See id.* ¶¶ 178-79.  Plaintiffs contend that these expenditures did not benefit any of the properties owned by LaManna or DeBello. *See id.* ¶ 179.

### e.  The Brae Burn Property

In July 2003, DeBello purchased the property at 28 Brae Burn Drive, Purchase, New York ("the Brae Burn Property") for $2.5 million. *See id.* ¶ 180.  He did so upon the advice of DeVito, Jr. and Forbes. *See id.*  Plaintiffs allege that the mortgage financing for the property, which was arranged by DeVito, Jr., Forbes, and Cherico, was orchestrated by DeVito, Jr. and Forbes as a means to steal money from the PREG account. *See id.* ¶¶ 181-82.

After he purchased the property, DeBello rented it at a substantially reduced rate to DeVito, Jr. to use as a personal residence. *See id.* ¶ 187.  Plaintiffs allege that the DeVitos used the money in the PREG account to pay for the monthly rent and to fund their extravagant lifestyles, while falsely claiming to use the money for renovation work on the various PREG properties. *See id.* ¶¶ 188-89.

8

## II.     STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim pursuant to Federal Rule of

Civil Procedure 12(b)(6), a complaint must plead sufficient "facts to state a claim to relief that is

plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To be

plausible, the plaintiff's factual allegations must demonstrate "more than a sheer possibility that

a defendant has acted unlawfully" and that the plaintiff's claim is more than merely

"conceivable." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 1951 (2009).  In evaluating the

plaintiff's claims, a district court must accept the factual allegations contained in the complaint

as true and draw all reasonable inferences in favor of the plaintiff.  *See Chambers v. Time*

*Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  The district court, however, is "not bound to

accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 129 S.Ct. at 1949-50

(citations and quotations omitted).

In considering a motion to dismiss for failure to state a claim, the district court is limited

to the facts stated in the complaint, documents attached to the complaint as exhibits, documents

incorporated by reference in the complaint, and documents integral to the complaint that are not

incorporated into it by reference.  *See Chambers*, 282 F.3d at 152-53.  If the motion includes

material outside of the pleadings and that material is not excluded by the court, the motion must

be converted from a motion to dismiss to one for summary judgment.  *Id.* at 152.

## III.    DISCUSSION

### a.  Civil RICO Claims

Pursuant to 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

9

a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).  To state

a claim pursuant to § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through

a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496

(1985).  These elements must be established as to each individual defendant.  *See DeFalco v.*

*Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).  Thus, "a complaint under § 1962(c) must charge each

named defendant with engaging in specific racketeering acts, constituting a pattern within the

meaning of the statute, committed by that defendant in the course of conducting the affairs of the

enterprise." *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074, 2003 WL 22251352, at *10 (S.D.N.Y.

Sept. 30, 2003).

 "In considering civil RICO claims, a court must be mindful of the devastating effect such

claims may have on defendants." *Manhattan Telecommunications Corp., Inc. v. DialAmerica*

*Marketing, Inc.*, 156 F.Supp.2d 376, 380 (S.D.N.Y. 2001); *see also Katzman v. Victoria's Secret*

*Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996), *aff'd mem.*, 113 F.3d 1229 (2d Cir. 1997)

("Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear

device.").  Accordingly, courts should look "with particular scrutiny" at civil RICO claims to

ensure that the RICO statute is used for the purposes intended by Congress.  *Goldfine v.*

*Sichenzia*, 118 F.Supp.2d 392, 397 (S.D.N.Y. 2000).  "Because the mere assertion of a RICO

claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts

should strive to flush out frivolous RICO allegations at an early stage of the litigation."

*Manhattan Telecommunications*, 156 F.Supp.2d at 380 (quotations omitted).

 It is not clear from the rambling and often incoherent accusations made in the seventy-six

page Amended Complaint which of the Defendants are alleged to have committed substantive

RICO violations.  Count 1, one of the substantive RICO claims, is captioned as against only

DeVito, Jr.  In stating this claim, Plaintiffs allege that the following Defendants were associated in fact: DeVito, Jr., Sherri DeVito, DeVito, Sr., Forbes, Liscio, and Armano.  *See* Am. Compl. ¶ 242.  Count 2, the second of the substantive RICO claims, is captioned as against only Forbes.  In stating this second claim, Plaintiffs allege that the following Defendants were associated in fact: DeVito, Jr., Sherri DeVito, DeVito, Sr., Forbes, Cherico, and DiDonato.  *See id.* ¶ 250.  Plaintiffs also generally allege that various predicate acts were committed by DeVito, Jr., Sherri DeVito, DeVito, Sr., Forbes, DiDonato, Cherico, Jones, Zebicoff, Tarantino, Armano, Ripps, Liscio, Cardasco, and Crystal Restoration Corporation.  *See id.* ¶¶ 230-36, 323-32.  In describing specific predicate acts, Plaintiffs additionally allege the involvement of The Jones Firm, The Johnson Family Trust, Cherico & Cherico Associates, and Barry Levites.  *See id.* ¶ 233.  For purposes of deciding the motions to dismiss, this Court will assume that Plaintiffs have alleged substantive RICO violations by each of these Defendants.  That is, this Court proceeds as though Plaintiffs have alleged substantive RICO violations by DeVito, Jr., Sherri DeVito, DeVito, Sr., Forbes, DiDonato, Cherico, Cherico & Cherico Associates, Jones, The Jones Firm, Zebicoff, Tarantino, Armano, Ripps, Liscio, Cardasco, Crystal Restoration Corporation, The Johnson Family Trust, and Levites.

### i.  Existence of an Enterprise

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An enterprise, at its root, is "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  The existence of an enterprise is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a

continuing unit." *Id.* For an association of individuals to constitute an "association in fact" enterprise, they must "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993) (quotations omitted), *aff'd* 27 F.3d 763 (2d Cir. 1994).

While the Supreme Court has held that a RICO enterprise must be "an entity separate and apart from the pattern of activity in which it engages," 452 U.S. at 583, the Second Circuit repeatedly has held since then that an enterprise "need not necessarily have a continuity extending beyond the performance of the pattern of racketeering acts alleged, or a structural hierarchy, so long as it is in fact an enterprise as defined in the statute." *Pavlov v. Bank of New York Co., Inc.*, 25 Fed. App'x. 70, 71 (2d Cir. 2002); *see also United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991) ("proof of various racketeering acts may be relied on to establish the existence of the charged enterprise").

Plaintiffs allege several alternative RICO enterprises in the Amended Complaint: (1) PREG itself; (2) DeVito, Jr. and Forbes; (3) The Johnson Family Trust; (4) DeVito, Jr., Sherri DeVito, and DeVito, Sr.; (5) DeVito, Jr., Sherri DeVito, DeVito, Sr., Forbes, Liscio, and Armano; and (6) DeVito, Jr., Sherri DeVito, DeVito, Sr., Forbes, Cherico, and DiDonato. *See* Am. Compl. ¶¶ 238-42, 248-50. In Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint, Plaintiffs suggest another possible enterprise: "[t]here is essentially one main, overarching, grand association-in-fact enterprise, brought together by Dominick DeVito[, Jr]." *See* Pl. Mem. of Law in Opp. to Def. Mot. to Dismiss the Compl. ("Pl. Mem. of Law") at 2.

Plaintiffs describe the structure of the overall association in fact as follows:

12

> At the core of this enterprise was DeVito, [Jr.,] who had the experience, knowledge and connections to gather certain people to play crucial roles in this scheme to defraud Plaintiffs. Each Defendant-member of this enterprise was responsible for performing certain designated activities for PREG and DeVito[, Jr.] to further the enterprise's overall purpose of defrauding Plaintiffs. . . . Defendants used their individual expertise as trained licensed professionals and skilled real estate experts to ban together and create a series of schemes to achieve one common goal: to defraud money from Plaintiffs. The foundation for the enterprise was based on greed, and the defendants entered the enterprise knowing full well and with full disclosure what the terms were.

See *id.* at 8 (citations and quotations omitted). Plaintiffs further allege that each Defendant "used [his or her] expertise in various areas of real estate (i.e. insurance, mortgages, transactions, contracts, title issues, etc.)" and "shared the same motives (greed) and goals (defraud as much money from Plaintiffs as possible). *See id.* at 2-3. Plaintiffs claim that all Defendants knew each other, knew of each other's purposes in the scheme, and worked collaboratively to enhance the enterprise. *See id.* at 5.

At the November 7, 2006, oral argument before this Court, Plaintiffs again referred to the enterprise in terms of an overarching scheme. *See* Oral Argument Transcript dated November 7, 2006 ("Oral Arg. Tr.") at 74-75. In fact, despite pleading alternative enterprises, Plaintiffs repeatedly referred to the enterprise only as one overall scheme. *See id.* at 63, 65, 74-75. Accordingly, this Court considers Plaintiffs' allegations regarding the alternative enterprises contained in the Amended Complaint to have been withdrawn and analyzes the RICO claim only as Plaintiffs have alleged the enterprise in terms of an overall scheme.

Given this Court's discussion of the RICO pattern requirement below, this Court assumes, *arguendo* and solely for purposes of this analysis, that Plaintiffs have sufficiently pled the existence of an enterprise for RICO purposes.

## ii. Predicate Acts

Certain specified state and federal crimes constitute predicate acts for RICO purposes. *See* 18 U.S.C. § 1961(1) (listing offenses).  Plaintiffs have alleged that the predicate acts in which various Defendants participated are mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, bank fraud, 18 U.S.C. § 1344, and identity fraud, 18 U.S.C. § 1028.[6]  *See* Am. Compl. ¶¶ 230-36, 321-32.

Federal Rule of Civil Procedure 9(b) governs the pleading requirements for RICO claims for which the predicate illegal act is fraud.  *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172-73 (2d Cir. 1999).  Under Rule 9(b), allegations of fraud in the RICO context must be made with particularity and must "specify the statements [plaintiffs] claim[] were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.  *Id.* (quotations omitted).  While courts have made an exception to the particularity requirements and have allowed "allegations [to] be based on information and belief when facts are peculiarly within the opposing party's knowledge," this exception "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations," especially in the context of RICO claims.  *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990); *see also Wilson v. Toussie*, 260 F.Supp.2d 530, 537 (E.D.N.Y. 2003) ("[I]n civil RICO actions, the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency" (quotations omitted).).

---

[6] Although Plaintiffs allege identity fraud as a separate cause of action, *see* Am. Compl. ¶¶ 321-32, there is no private right of action for identity fraud under 18 U.S.C. § 1028. *See Prince v. City of New York*, No. 08 Civ. 5400, 2009 WL 2778262, at *1 n. 3 (S.D.N.Y. Sept. 2, 2009). Accordingly, this Court construes Plaintiffs' identity fraud claims as alleging identity fraud as a predicate RICO act.

Plaintiffs specifically allege that DeVito, Jr., Sherri DeVito, DeVito, Sr., Forbes, DiDonato, Cherico, Jones, Zebicoff, Tarantino, Armano, Ripps, Liscio, and Cardasco committed mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. *See* Am. Compl. ¶¶ 230-35. In identifying specific acts of mail and wire fraud, Plaintiffs also allege that acts were committed by The Jones Firm, The Johnson Family Trust, Cherico & Cherico Associates, and Levites. *See id.* ¶ 233. Plaintiffs additionally allege—in one conclusory statement that ends mid-sentence without offering any support whatsoever for the claim—that DeVito, Jr., Sherri DeVito, DeVito, Sr., Forbes, DiDonato, Cherico, Jones, Zebicoff, Tarantino, Armano, Ripps, Liscio, and Cardasco committed bank fraud in violation of 18 U.S.C. § 1344. *See id.* ¶ 236. Plaintiffs further allege that Forbes, DiDonato, Liscio, Cardasco, and Crystal Restoration Corporation committed identity fraud in violation of 18 U.S.C. § 1028. *See id.* ¶¶ 323-32.

Given this Court's discussion of the RICO pattern requirement below, this Court assumes, *arguendo* and solely for purposes of this analysis, that Plaintiffs have pled the alleged predicate acts with sufficient particularity to state a claim.

### iii.  Pattern of Racketeering Activity

The RICO statute provides that a pattern of racketeering activity must consist of "at least two acts of racketeering activity" undertaken within ten years. 18 U.S.C. § 1961(5). The Supreme Court has elaborated on this requirement, holding that the acts must "amount to or pose a threat of continued criminal activity" and must be "related." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). "'[C]ontinuity' means that separate events occur over time and perhaps threaten to recur, while 'relatedness' means—given that different acts of racketeering activity have occurred—that there is a way in which the acts may be viewed as

having a common purpose." *Procter & Gamble Co. v. Big Apple Industrial Buildings, Inc.*, 879 F.2d 10, 17 (2d Cir. 1989).

### 1. Continuity

Continuity may be closed- or open-ended, with closed-ended referring to a pattern of criminal activity extending over a substantial period of time and open-ended referring to past criminal conduct that projects into the future with a threat of repetition. *See H.J. Inc.*, 492 U.S. at 241-42.; *see also GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 466 (2d Cir. 1995). Whether closed- or open-ended, continuity is "centrally a temporal concept." *H.J. Inc.*, 492 U.S. at 242. Plaintiffs allege closed- and open-ended continuity in the alternative. *See* Am. Compl. ¶¶ 245, 253; Oral Arg. Tr. at 66-69.

### a.  Closed-Ended Continuity

Closed-ended continuity is established by "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. Courts have pointed repeatedly to duration as the most important factor in determining whether a closed-ended RICO pattern exists. *See First Capital Asset Management, Inc. v. Brickellbush, Inc.*, 219 F.Supp.2d 576, 585 (S.D.N.Y. 2002). Since the Supreme Court decided *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), the Second Circuit has not held that a period of less than two years has amounted to a period of time sufficiently substantial to make out a closed-ended pattern. *See, e.g., Spool v. World Child International Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008). Although the Second Circuit has "not viewed two years as a bright-line requirement," it noted that "it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity." *Id.* In evaluating closed-ended continuity, the Second Circuit has directed district courts to "take care to ensure that the plaintiff is not artificially fragmenting a singular act into

16

multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119
F.3d 91, 97-98 (2d Cir. 1997).

The Second Circuit has held that acts that occur over periods longer than two years do not
automatically constitute closed-ended continuity. *See, e.g.*, *First Capital Asset Management,
Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) ("[W]hile two years may be the
*minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts
span two years is insufficient, without more, to support a finding of a closed-ended pattern.").
Other non-dispositive factors, including "the number and variety of predicate acts, the number of
both participants and victims, and the presence of separate schemes are also relevant in
determining whether closed-ended continuity exists." *Id.* (quotations omitted).

Plaintiffs argue that "the predicate acts took place over a two year period, to wit: from the
creation of PREG (May 10, 2002) at least until the submission of affidavits to the Supreme Court
of the State of New York, County of Westchester, in opposition to Plaintiff's action to vacate
Mechanics liens filed by DeVito[, Jr.] against property owned by Plaintiff DeBello at 28
Braeburn [sic] Drive, Purchase, New York." *See* Pl. Mem. of Law at 26; *see also* Oral Arg. Tr.
at 66-67. Plaintiffs, however, do not appear to allege any racketeering activity in connection
with the creation of PREG, and thus that cannot form the starting point of Defendants' pattern of
racketeering activity. *See Spool*, 520 F.3d at 184 ("The relevant period . . . is the time during
which RICO predicate activity occurred, not the time during which the underlying scheme
operated or the underlying dispute took place."). Instead, the allegations of predicate acts do not
begin until July 1, 2002, when Plaintiffs allege that a facsimile was sent from DiDonato to John
DeBello. *See* Am. Compl. ¶ 233. It appears that the only predicate act Plaintiffs allege with
respect to the mechanics lien is a June 16, 2004, notice sent by mail from DeVito, Jr. and Sherri

DeVito to LaManna. *See id.* The span from July 1, 2002, through June 16, 2004, of course, is less than two years. Although not referenced either in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint or at oral argument, Plaintiffs additionally allege in the Amended Complaint that, on January 25, 2005, Tarantino mailed a deed involving the Purchase Street Property to himself and Cherico. *See id.* Consideration of this predicate act expands the alleged duration of the predicate acts to span more than two years. The duration of the alleged predicate acts, while perhaps long enough to constitute a closed-ended pattern, is not itself dispositive of such a pattern.

The additional factors that the Second Circuit has directed district courts to consider—including the number and variety of the predicate acts, the number of both participants and victims, and the presence of separate schemes—do not support a finding of closed-ended continuity under the facts alleged. The predicate acts that Plaintiffs have alleged include twenty-two acts of mail and wire fraud, as well as bank fraud and identity fraud. Although this Court has accepted these allegations as adequately pled for purposes of this discussion, Plaintiffs have not provided sufficient information from which this Court can conclude that the predicate acts establish closed-ended continuity. Plaintiffs offer little information about the substance of the mail and wire fraud acts and absolutely no information, beyond their own conclusory assertions, about the bank fraud and identity fraud acts. Further, although the Amended Complaint names over twenty-five Defendants, Plaintiffs have made only flimsy allegations regarding the involvement of many of these Defendants. Indeed, the crux of the claims, as alleged and liberally construed, center around only nine of the Defendants: DeVito, Jr., Sherri DeVito, DeVito, Sr., Forbes, DiDonato, Cherico, Jones, Liscio, and Cardasco. Plaintiffs identify only three specific victims of the alleged scheme: Joseph and Antonella LaManna and John DeBello.

18

Finally, although Plaintiffs have made numerous inconsistent claims regarding Defendants'
activities, they seem ultimately to allege one overarching scheme, rather than separate schemes.
These factors, considered along with the relatively short time span over which the predicate acts
allegedly occurred, do not suggest a continuous scheme.

This Court thus finds that Plaintiffs have not established closed-ended continuity.
Because this Court reaches this conclusion even when considering the alleged scheme in its
entirety and viewing all of the alleged predicate acts together, this Court need not separately
analyze whether Plaintiffs have established closed-ended continuity for individual Defendants.

### b.  Open-Ended Continuity

Open-ended continuity requires a showing of "a threat of continuing criminal activity
beyond the period during which the predicate acts were performed." *Cofacredit, S.A. v. Windsor
Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999).  To determine whether there is a
threat of continuing criminal activity, "the nature of the RICO enterprise and of the predicate acts
are relevant." *Id.*  The Supreme Court has identified several ways in which open-ended
continuity may be established, including where the predicate acts "include a specific threat of
repetition extending indefinitely into the future," where the acts form "part of a long-term
association that exists for criminal purposes," or where the acts constitute "a regular way of
conducting [an] ongoing legitimate business." *H.J. Inc.*, 492 U.S. at 242-43.  The Supreme
Court was careful to note, however, that these are not the only ways in which open-ended
continuity may be established. *See id.* at 242. The Second Circuit has observed that inherently
unlawful acts, such as murder, committed in pursuit of inherently unlawful goals, such as
narcotics trafficking, are generally found to generate the requisite threat of continuity even if the
time period is short, while racketeering activities furthering endeavors that are not inherently

19

unlawful, such as frauds in the sale of property, are generally found wanting despite even longer

periods of time. *See United States v. Aulicino*, 44 F.3d 1102, 1111-12 (2d Cir. 1995) (citations

omitted). The Second Circuit also has held that where the scheme is inherently terminable,

open-ended continuity does not exist. *See GICC*, 67 F.3d at 466.

      Plaintiffs allege that open-ended continuity exists because the predicate acts were

DeVito, Jr. and Forbes' regular way of conducting business and that such business practices

would continue into the future. *See* Am. Compl. ¶¶ 245, 253. It is not enough for Plaintiffs to

claim that the predicate acts were the regular way of doing business. It must also be that the

business at issue is ongoing, thereby making it likely that the racketeering acts will continue into

the future. Here, Plaintiffs have not alleged that PREG or any other legitimate business existed

at the time the Complaint was filed, and therefore there can be no concern that racketeering acts

would continue as part of that business. Accordingly, Plaintiffs' claim does not establish a basis

upon which this Court can conclude that open-ended continuity exists.

      Nor do Plaintiffs' conclusory assertions that "[a]ll of the predicate acts of mail and wire

fraud, insurance frauds, inflated appraisals on property bought by Plaintiffs, and various other

scams completed by the enterprise all have threats of future criminal activity," and that

Defendants "clearly had and maintain a continuing intent and the ability to carry on the

racketeering activities against Plaintiffs indefinitely," establish open-ended continuity. *See* Pl.

Mem. of Law at 24-25. Plaintiffs have not alleged any basis from which this Court can conclude

that continuation or repetition of the racketeering activities at issue was likely at the time the

Complaint was filed. Plaintiffs have not alleged either that Defendants had attempted to

continue perpetuating the scheme against Plaintiffs or that Defendants had attempted to defraud

others using a similar scheme. The allegations here thus differ meaningfully from other cases in

which the Second Circuit has found open-ended continuity in the absence of inherently unlawful

acts committed in pursuit of inherently unlawful goals. *See DeFalco v. Bernas*, 244 F.3d 286,

324 (2d Cir. 2001) (evidence that defendants' escalating threats "indicated that they had no

intention of stopping once they met some immediate goal" was sufficient for a jury to find a

threat of continued criminal activity); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir.

1994) (series of fraudulent sales of securities over at least one year, coupled with the fact that the

defendants apparently had been trying to continue to sell securities, was sufficient to establish a

RICO pattern and thus summary judgment on those grounds was inappropriate); *Beauford v.

Helmsley*, 865 F.2d 1386, 1392 (2d Cir. 1989) (en banc), *vacated and remanded mem.*, 492 U.S.

914 (1989), *adhered to on remand*, 893 F.2d 1433 (2d Cir. 1989) (allegations that defendants had

engaged in a one-time mailing of more than 8,000 copies of fraudulent documents in connection

with a condominium conversion plan along with a basis to infer that similar mailings would

occur in the future sufficiently pled a pattern of racketeering activity and thus dismissal on those

grounds was inappropriate); *Procter & Gamble*, 879 F.2d at 18 (allegations that defendants

embarked on a scheme that would necessarily involve racketeering activities over the course of a

ten year lease period sufficiently pled a pattern of racketeering activity and thus dismissal on

those grounds was inappropriate).

  Plaintiffs also argue that the threat of continued criminal activity is established by the

financial harms to which they have continued to be exposed and which have the potential to

continue in the future. Plaintiffs allege numerous such harms, including: (1) "the fraudulent

mechanics liens Defendants [sic] DeVito[, Jr.] filed against Plaintiff LaManna's Purchase Street

Property on June 16, 2004, well after the schemes regarding the foreclosures, sales and/or

judgments of properties involved in the enterprise were under way," *see* Pl. Mem. of Law at 24;

(2) the "no less than four foreclosure actions on related properties" that LaManna has faced, *see id.*; (3) the financial harms that have already and continue to hurt LaManna as a result of Cherico's purchase of the Cherico parcel, *see id.* at 25; (4) the lawsuit by Cherico for unpaid legal bills, *see id.*; (5) the continued receipt of invoices from attorneys involved in the various purchases, *see id.*; (6) the separate actions filed by DeVito, Jr. against Plaintiffs (now consolidated with the instant action) which Plaintiffs contend "are clearly retaliatory in nature," *see id.*

The financial harms Plaintiffs allege do not establish a threat of continued criminal activity. Plaintiffs have not alleged any criminal activity regarding the mechanics lien DeVito, Jr. filed on the Purchase Street property, the foreclosures on LaManna's properties, the lawsuit by Cherico, the invoices sent by other attorneys involved in the various property purchases, or the lawsuits that DeVito, Jr. filed against Plaintiffs. Each of these acts, as alleged, is legal, and thus cannot constitute a continued threat of criminal activity. While Plaintiffs have various means available for challenging each of these acts—indeed, Plaintiffs have already utilized one appropriate means with respect to the mechanics lien, which LaManna successfully challenged in other legal proceedings—the instant RICO action is not one of those means. Plaintiffs' allegation that LaManna was and continues to be financially harmed by Cherico's purchase of the Cherico parcel likewise does not establish a threat of continuing criminal activity. Plaintiffs do not explain how either past or potential future monetary damages amount to a threat of future criminal activity, and this Court cannot conclude that they do.

That the scheme Plaintiffs allege was inherently terminable further supports that open-ended continuity does not exist here. Once they became suspicious that Defendants were defrauding them, Plaintiffs had the ability to prevent further injury by denying Defendants access

to the PREG properties and bank account. Indeed, Plaintiffs acknowledge that they "disassociat[ed] with the enterprise." *See* Pl. Mem. of Law at 25. Irrespective of whether Plaintiffs in fact terminated Defendants' access—which the parties do not appear to specifically allege either way—Plaintiffs could have terminated the scheme and thereby prevented the Defendants from engaging in future criminal activity.

Plaintiffs' allegations thus do not amount to more than "a serious, but discrete and relatively short-lived scheme to defraud a handful of victims, which is insufficient to establish open-ended continuity." *Spool*, 520 F.3d at 186 (quotations omitted). Having reached this conclusion even when considering all of Plaintiffs' allegations in their totality, this Court need not separately analyze whether Plaintiffs have established open-ended continuity for individual Defendants.

Because Plaintiffs have not established either closed- or open-ended continuity, they have not established a pattern of racketeering activity. Accordingly, this Court dismisses the RICO claims against Tarantino, Jones, Zebicoff, and The Jones Firm.

### 2. Relatedness

Having found that Plaintiffs did not adequately plead continuity and thus failed to state RICO claims, this Court need not reach the question of whether Plaintiffs have sufficiently pled the relatedness of the predicate acts.

### b. RICO Conspiracy

Plaintiffs allege that DeVito, Jr., Sherri DeVito, DeVito, Sr., Forbes, DiDonato, Cherico, Jones, Zebicoff, Tarantino, Armano, Ripps, Liscio, and Cardasco conspired to violate RICO. *See* Am. Compl. ¶¶ 256, 260. However, "[t]he Second Circuit has held that there can be no RICO

conspiracy without a substantive RICO violation." *Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.*, 165 F.Supp.2d 514, 540 (S.D.N.Y. 2001).

Having dismissed the RICO claims, this Court now also dismisses the RICO conspiracy claims.

### c. State Law Claims

Subject matter jurisdiction over the state law claims and over the Defendants not named in the RICO counts is alleged based on supplemental jurisdiction. Where federal law claims are dismissed before trial, district courts ordinarily decline supplemental jurisdiction. *See, e.g., Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n. 7 (1988); *see also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (a district court's decision to exercise its power to hear supplemental state law claims is squarely within its discretion).

As the RICO and RICO conspiracy claims have been dismissed, this Court is not obliged to exercise supplemental jurisdiction, and it declines to do so.[7]

### d. Amendments to the Amended Complaint

Plaintiffs have requested leave to further amend their Amended Complaint. *See* Oral Arg. Tr. at 71. Pursuant to Federal Rule of Civil Procedure 15(a)(2), a district court "should freely give leave [to amend] when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). While the decision to grant or deny leave to amend a pleading is within the discretion of the district court, absent an "apparent or declared reason," the mandate to freely grant leave to amend should be heeded. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Such reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to

---

[7] Having dismissed all claims against Tarantino, Jones, Zebicoff, and The Jones Firm, based on Plaintiffs' failure to establish the RICO claims, this Court need not consider the alternative grounds for dismissal raised in these Defendants' motions to dismiss.

cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment." *Id.*

Plaintiffs have offered no indication of what a second amended complaint would contain. In light of Plaintiffs' previous amendment and their failure to identify how additional amendments will cure the deficiencies in the Amended Complaint, this Court denies Plaintiffs leave to amend. *See, e.g.*, *Arnold v. KPMG LLP*, 334 Fed. App'x 349, 352-53 (2d Cir. 2009) (district court did not abuse its discretion in denying plaintiff leave to amend the complaint where plaintiff failed to identify with sufficient specificity those facts that would save the complaint).


**IV.   CONCLUSION**

For the reasons discussed above, this Court grants the following motions to dismiss: (1) Albert Tarantino; and (2) Stephen Jones, Christian Zebicoff, and Jones, Sledzik, Garneau & Nardone, P.C.  The Clerk of the Court is directed to terminate docket entries # 148 and 152 and to close the case.  The Clerk of the Court is also directed to close *DeVito v. LaManna*, 06 Civ. 2760, and *DeVito v. DeBello et al.*, 06 Civ. 2761.


*It is so ordered.*


Dated: New York, New York

_August 24_ , 2010

_____
Loretta A. Preska, U.S.D.J.